UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| ARTHUR LEONARD, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | CIVIL ACTION | |
| | ) | NO. 11-11815-NMG | |
| PNC BANK, NA, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

February 3, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of the efforts of the plaintiff, Arthur Leonard ("Leonard"), to

avert the foreclosure of his home by obtaining a mortgage loan modification from the

defendant, PNC Bank, NA ("PNC"), pursuant to the Home Affordable Modification

Program ("HAMP"), a government program which aims to provide relief to borrowers

who have defaulted or are likely to default on their mortgage loans by reducing payments

to sustainable levels without discharging any of the underlying debt.  Leonard alleges that

throughout the course of his dealings with PNC, the defendant engaged in unfair,

deceptive and otherwise unlawful conduct by, *inter alia*, making misrepresentations

regarding the plaintiff's obligation to make mortgage payments while his application for a

HAMP modification remained pending, issuing repeated requests for information that had

already been submitted, failing to carry out an expeditious review of the plaintiff's application, and reneging on its contractual obligation to provide Leonard with a permanent loan modification if he made timely payments under the terms of a trial period plan.  He also claims that it was the defendant's own actions which "created the very conditions it ultimately cited as the reason for denying [his] modification" and eventually forced him to obtain a restraining order from this court in order to avoid foreclosure.  (Compl. (Docket No. 1) ¶ 50).  By his Verified Complaint, Leonard has asserted six causes of action against PNC, including a claim for declaratory judgment that PNC violated Mass. Gen. Laws ch. 244, § 35A by failing to properly notify Leonard of his right to cure the default on his mortgage (Count I), as well as claims for breach of contract (Count II), breach of the implied duty of good faith and fair dealing (Count III), promissory estoppel (Count IV), negligence (Count V), and violation of Mass. Gen. Laws ch. 93A (Count VI).

The matter is presently before the court on the "Defendant's Motion for Summary Judgment" (Docket No. 31), by which PNC is seeking summary judgment pursuant to Fed. R. Civ. P. 56.  In support of its motion PNC contends, in essence, that it fulfilled all of its obligations under its loan-related agreements with the plaintiff, and that Leonard's inability to obtain a loan modification during the relevant time period was due to his own failure to provide the documentation necessary to establish his eligibility for relief under HAMP rather than any misconduct on the part of PNC.  Accordingly, the defendant asserts that all of Leonard's claims must fail as a matter of law, and that it is entitled to summary judgment on all Counts of Leonard's Verified Complaint.

As described below, this court finds that there is a disputed issue of fact as to whether Leonard submitted all of the documentation necessary to qualify for a permanent loan modification under HAMP, as a result of which PNC is not entitled to summary judgment on plaintiff's claims of breach of contract, breach of implied covenant of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A.  However, this court further finds that Leonard's claims for violation of Mass. Gen. Laws ch. 244, § 35A, promissory estoppel, and negligence must fail as a matter of law.  Accordingly, and for all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that PNC's motion for summary judgment be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that the defendant's motion be allowed with respect to Counts I, IV and V of Leonard's Verified Complaint, but denied with respect to Counts II, III and VI.

## II.  **STATEMENT OF FACTS**[1]

The following facts relevant to the defendant's motion for summary judgment are undisputed unless otherwise indicated.[2]

---

[1]  The facts are derived from the following materials: (1) the Local Rule 56.1 Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("DF") (Docket No. 33); (2) the Affidavit in Support of Defendant's Motion for Summary Judgment submitted by Brian J. Arthur ("Arthur Aff.") and the exhibits attached thereto ("Def. Ex. __") (Docket No. 34); (3) the exhibits attached to the August 22, 2013 Declaration of Michael T. Grant ("Def. Supp. Ex. __") (Docket No. 35); (4) the Plaintiff's Response to Defendant's Statement Undisputed Material Facts ("PR") and Statement of Additional, Disputed Facts ("PF") (Docket No. 43); (5) the exhibits attached to the Affidavit of Plaintiff's Counsel ("Pl. Ex. __") (Docket No. 44) ; (6) the exhibit attached to the November 6, 2013 Declaration of Michael T. Grant ("Def. 2d Supp. Ex. __") (Docket No. 53); and (7) documents describing Leonard's unemployment benefits, which were submitted by the plaintiff during oral argument and are Bates-stamped PNC 0626, PNC 0669, PNC 0671, and PNC 0886 ("Pl. Supp. Ex. __").  Additionally, under the law of this circuit, "a verified complaint ought to be treated as the functional equivalent of an affidavit to the extent that it satisfies the standards explicated in [Rule 56(c)(4)]." Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991).  Accordingly, this court has relied on the factual averments set forth in the Verified Complaint ("Compl.") (Docket No. 1) to the extent they reflect Leonard's personal knowledge.  See id. at 1262-63 (finding that "factual averments of the [verified] complaint, to the extent demonstrated to come within [plaintiff's] personal knowledge, were fully tantamount to a counter-affidavit, and hence, worthy of consideration" on summary judgment).

[2]  The plaintiff has attempted to dispute many of PNC's factual assertions based on testimony from PNC's corporate representative, Dorothy J. Thomas, in which Ms. Thomas stated that she lacked specific knowledge or could not recall the details of various communications and transactions at issue in this case.  (See, e.g., PR ¶¶ 6, 7, 13, 24, 32).  As a general statement, the plaintiff's reliance on Ms. Thomas' lack of knowledge or recollection is not enough to create a disputed issue of fact for purposes of summary judgment.  See I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc., 182 F.3d 51, 55-56 (1st Cir. 1999) ("mere lack of recollection does not suffice to create an issue of fact").  Rather, Fed. R. Civ. P. 56 "demands that [the party opposing summary judgment] show specific facts indicating that a genuine issue does indeed exist for trial." Id. (quoting Posey v. Skyline Corp., 702 F.2d 102, 106 (7th Cir. 1983)).  Therefore, to the extent PNC's factual assertions are supported by evidence in the record, and the plaintiff has failed to present any affirmative evidence to dispute those facts, this court has considered them to be undisputed for purposes of the pending motion.

### Leonard's Mortgage Obligation

As described above, this case arises out Leonard's efforts to obtain a loan modification under a federal program known as HAMP.  The plaintiff and his former wife, Karen M. Leonard (collectively, the "Borrowers"), obtained the loan at issue from Commonwealth United Mortgage Company, a division of National City Bank of Indiana, pursuant to a promissory note dated May 2, 2005 ("Note").  (DF ¶ 1).  The principal amount of the loan was $304,000, and it was secured by a mortgage ("Mortgage") on Leonard's home in Middleboro, Massachusetts (the "Property").  (Id. ¶¶ 1, 2; PR ¶ 1, 2).  National City Bank of Indiana merged into National City Bank effective July 22, 2006, and on November 6, 2009, National City Bank merged into PNC.  (DF ¶¶ 3, 5).  Consequently, PNC and its predecessors have had physical possession of the plaintiff's Note and Mortgage at all relevant times.[3]  (Arthur Aff. ¶ 8; see also Def. Exs. 1-5).

In 2008, the Borrowers and PNC entered into a Loan Modification Agreement, effective as of May 1, 2008, under which PNC agreed to modify the terms of the Note and Mortgage (the "2008 Loan Modification").  (Def. Ex. 6).  Pursuant to the 2008 Loan Modification, Leonard and his wife agreed to make monthly payments of $1,731.24 in principal and interest beginning on June 1, 2008.  (DF ¶ 9).  They also remained responsible for any taxes, assessments, and insurance premiums, including any mortgage insurance premiums, related to the Property.  (Id. ¶ 10).  In connection with the 2008

---

[3]  For the sake of simplicity, this court has referred to PNC and its predecessors collectively as "PNC" throughout this Report and Recommendation.

Loan Modification, the plaintiff executed a "Notice of No Oral Agreements."  (Id. ¶ 8).

That Notice provided in relevant part as follows:

> THIS WRITTEN LOAN AGREEMENT REPRESENTS THE
> FINAL AGREEMENT BETWEEN THE PARTIES AND MAY
> NOT BE CONTRADICTED BY EVIDENCE OF PRIOR,
> CONTEMPORANEOUS, OR SUBSEQUENT ORAL OR
> SUBSEQUENT ORAL [sic] AGREEMENTS OF THE PARTIES.

(Def. Ex. 6 at 9).

The Borrowers remained bound by the terms of the Note and Mortgage to the extent they were not modified by the 2008 Loan Modification.  (Id. at 3 ¶ 5).  The Note provided that if the Borrowers failed to "pay the full amount of each monthly payment on the date it is due," they would be in default.  (DF ¶ 11; Def. Ex. 1 ¶ 6(B)).  It also provided that, upon default, the holder of the Note was authorized to send the Borrowers a written notice of default informing them that if they did not pay the overdue amount by a certain date, they would be required  "to pay immediately the full amount of Principal which has not been paid and all the interest [owed] on that amount."  (DF ¶ 11; Def. Ex. 1 ¶ 6(C)).  As described below, in 2009 Leonard and his wife defaulted by failing to make payments due under the 2008 Loan Modification.

### The Plaintiff's Default

Leonard lost his job in November 2008.  (PF ¶ 2).  Consequently, he became concerned about his ability to continue to make his mortgage payments, and he contacted PNC to inquire about the availability of a new loan modification.  (Id.).  The defendant's representatives informed Leonard that he would receive an application packet in the mail,

but the plaintiff had to call PNC on multiple occasions before finally receiving the requested information in March 2009.  (Id. ¶ 3).  By that time, Leonard's income had decreased from about $64,000 a year to approximately $34,000 a year, or $2,830 a month.  (Id. ¶ 4).  Leonard claims that he completed all of the paperwork required to obtain a modification, and submitted it to the defendant.  (Id. ¶ 5; Compl. ¶ 25).  For its part, PNC denies that it received any documentation from the plaintiff at any time during the spring of 2009.  (DF ¶¶ 18-21).

Initially, after losing his job, Leonard continued to remain current on his Mortgage. (PF ¶ 4).  However, during various telephone conversations with PNC customer service representatives, he was told that he would not qualify for a loan modification unless he stopped making mortgage payments for up to three months.  (PF ¶ 5; Pl. Ex. A at 59, 61-62, 87, 93).  He also was assured that any arrearages would be folded into the modified loan.  (Compl. ¶ 26).  Based on these representations, Leonard stopped making his mortgage payments, and by April 2009, Leonard had failed to make two monthly installment payments and had fallen into default on the Mortgage.  (See PF ¶ 4; DF ¶¶ 12, 14-15).

Leonard claims that  up until the final denial of his request for a loan modification in January 2011, PNC representatives repeatedly assured him that there was no need to resume payments on his Mortgage, and that any arrearages would be rolled into a modified loan.  (PF ¶ 32; see also Compl. ¶ 49).  He further asserts that on multiple occasions over the course of his prolonged efforts to obtain relief, he asked PNC whether

he could resume making payments on his Mortgage, and was instructed not to do so until he was approved for a modification.  (PF ¶¶ 32-33; Pl. Ex. A at 84, 87-88).

On April 15, 2009, PNC sent Leonard a letter informing him of the delinquency on his loan and explaining various potential alternatives to foreclosure, including, among other options, a repayment plan, loan modification, and a short sale.  (DF ¶ 19; Def. Ex. 10).  Following a telephone conversation between the parties on April 16, 2009, PNC also sent Leonard a workout package form letter in which it informed him of its goal in "helping you to continue enjoying the pride of home ownership" and requested information regarding the plaintiff's income and expenses.  (DF ¶ 20; Def. Ex. 11).  As described above, Leonard insists that he had already completed all of the paperwork requested in the loan modification application that he had received in March and submitted it to PNC, while PNC contends that it received none of the necessary documentation.  (See PF ¶ 5; Compl. ¶ 25; DF ¶¶ 18-20).  In any event, there is no dispute that in its April 16 letter to the plaintiff, PNC warned that "normal servicing of your loan will continue while the program review is in process.  Late charges will continue to be assessed according to the terms of your loan papers until you are accepted into the program."  (Def. Ex. 11 at 1). However, it did not explain how Leonard was supposed to reconcile this information with the advice he had received regarding the need to stop making mortgage payments if he wished to obtain a loan modification.  (See id.).

On April 20, 2009, PNC sent notices of default to each of the Borrowers by postage prepaid, first class U.S. Mail.  (Arthur Aff. ¶ 12).  Therein, PNC explained that

the plaintiff's mortgage loan was in default, and that the Borrowers were required to pay $4,625.96 within 90 days, by July 19, 2009, if they wished to cure the default.  (DF ¶ 14; Def. Ex. 7).  PNC also stated that any failure to cure the default by the July 19 deadline would result in the acceleration of the maturity date of the Note, thereby making all sums secured by the Mortgage immediately due and payable.  (Id.).  Leonard claims that he has no memory of receiving any such notice, and has not been able to locate a copy of it in his file.  (PR ¶ 13).  He also notes that the defendant has failed to produce a certified mail receipt demonstrating that the notices were actually mailed to him and his former spouse.  (See id.).  However, the plaintiff has not presented any affirmative evidence to undermine the testimony of PNC's witness that the correspondence was sent to the Borrowers via U.S Mail.  (See Arthur Aff. ¶ 12).

The parties spoke again on May 6, 2009, and the defendant sent Leonard another workout package form letter requesting income and expense information, and notifying him that normal loan servicing was continuing.  (Def. Ex. 12).  While PNC relies on this correspondence to support its assertion that it received no documentation from the plaintiff, Leonard testified that he completed all of the paperwork requested by PNC in the spring of 2009.  (See DF ¶ 21; Arthur Aff. ¶ 19; Compl. ¶ 25).  Moreover, although Leonard was unable to recall specifics regarding the particular correspondence he received from the defendant and when he received it, he testified as a general matter that he consistently responded to all of PNC's requests for missing information.  (See Pl. Ex.

A at 81).  Thus, he disputes the defendant's contention that he failed to submit the requested documentation.  (PR ¶ 18-21).

### Communications Concerning a HAMP Modification

On May 14, 2009, PNC sent Leonard a letter notifying him of the federal government's HAMP program.  (DF ¶ 22).  Therein, PNC stated that "[i]f you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Home Affordable Modification Program Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure."  (Def. Ex. 13 at 1).  The letter was accompanied by a document entitled, "Complete Your Checklist," which listed information that the plaintiff had to provide to PNC in order to take advantage of HAMP.  (DF ¶ 22; Def. Ex. 13 at 3).  Significantly, the Checklist specified that such documentation should include:

> For each borrower who has income such as social security, disability or death benefits, pension, public assistance, or unemployment:
> ☐ Copy of most recent federal tax return with all schedules and W-2 or copies of two most recent bank statements.
> ☐ Copy of benefits statement or letter from the provider that states the amount, frequency and duration of the benefit.  Social security, disability, death or pension benefits must continue for at least 3 years to be considered qualifying income under this program.  *Public assistance or unemployment benefits must continue for at least 9 months to be considered qualifying income under this program.*

(Def. Ex. 13 at 3 ¶ 4 (emphasis added)).  PNC further explained that once it received the documentation and verified the information, it would determine whether Leonard qualified for a modification under HAMP.  (Id. at 4-5).  If it determined that he was eligible, it

would offer him a Trial Period Plan ("TPP") under which he would be required to make trial period payments that would be close to the amount that he would pay under a modification.  (Id.).  Toward the end of the trial period, PNC would calculate the final amount and finalize the terms of a modified loan.  (Id.).  If the plaintiff successfully completed the trial period, he would need to execute a Modification Agreement, which would become effective after it was signed by the defendant.  (Id.).

The letter also informed Leonard that it could take up to thirty days for PNC to review his documents, that his request for a modification would be processed "as quickly as possible[,]" and that PNC would not initiate foreclosure proceedings or carry out a foreclosure sale as long as the plaintiff complied with the terms of a TPP.  (Id. at 6).  Leonard understood, based on this description, that if he successfully complied with a TPP by completing the paperwork and making trial period payments on time, he would be approved for a permanent modification and no foreclosure proceedings would take place.  (See PF ¶ 15; Pl. Ex. A at 58).

Leonard contends that he provided PNC with all of the financial information that it requested.  (PF ¶¶ 9-10; Compl. ¶¶ 30-31).  Nevertheless, as detailed below, PNC asserts that Leonard failed to establish his eligibility for a HAMP modification because he failed to submit documentation showing that his unemployment benefits would continue for at least nine months.

According to PNC's records, on May 18, 2009, Leonard sent PNC a letter explaining that he had been unemployed since November 2008, and inquiring whether there was

a program available that would help him avoid foreclosure. (Def. Ex 14 at 1). He also attached a Claimant Account Inquiry from the Massachusetts Department of Workforce Development, Division of Unemployment Assistance documenting his receipt of unemployment benefits. (Id. at 2). The Claimant Account Inquiry showed that Leonard had received a payment of $653 for the week ending May 9, 2009, and a payment of $653 for the week ending May 16, 2009. (Id.). It also showed that the plaintiff had a remaining balance of $11,932 in his unemployment insurance account, or enough to cover an additional eighteen weeks of payments. (Id.). PNC relies on these and other records to support its claim that Leonard failed to timely submit documentation showing that his unemployment benefits would continue for at least an additional nine months, whereas Leonard relies on testimony in which he maintained that he timely submitted all of the documentation, notwithstanding any letters to the contrary, and that he worked closely with PNC representatives to insure that his application was complete. (See Def. Mem. (Docket No. 32) at 10; PR ¶ 28; Pl. Ex. A at 81, 90). As described below, this court finds that the plaintiff's evidence is sufficient to create a genuine issue of fact as to whether the plaintiff's submissions were adequate to establish his eligibility for a HAMP modification. Therefore, resolution of that issue should be reserved for trial.

It is undisputed that Leonard failed to cure the default on his mortgage loan by July 19, 2009, and that the loan was referred to PNC's foreclosure department on or about July 20, 2009. (DF ¶ 15; Def. Ex. 16). In its letter notifying Leonard of the referral, PNC warned the plaintiff that "all foreclosure activity will continue until a

mortgage workout program is approved." (Def. Ex. 16). PNC also described some of the available workout programs, and instructed Leonard to call its toll free number if he wished to discuss his options. (Id.). The defendant made no reference to the fact that the parties had been communicating for months about Leonard's desire to pursue available workout options in order to avoid foreclosure, or the fact that Leonard had submitted information to PNC in an effort to obtain a loan modification. (See id.).

On August 24, 2009, PNC sent Leonard another letter inviting him to apply for a loan modification under HAMP, and advising him that if he met the eligibility criteria, he would be offered a TPP. (DF ¶ 27; Def. Ex. 17). The August 24 letter was nearly identical to the letter that PNC had sent to Leonard on May 14, 2009. (Compare Def. Ex. 17 with Def. Ex. 13). In particular, it contained the same Checklist of information that had to be submitted in order to qualify for the program, and contained the same description of the process for obtaining a loan modification. (Def. Ex. 17). Based on the representations made in the August 24, 2009 letter, Leonard continued to believe that if he completed the necessary paperwork and made timely payments under a TPP, there would be no foreclosure proceedings and he would be approved for a permanent loan modification. (PF ¶ 15).

Leonard claims that during this time period, he continued to contact PNC by phone to inquire about the status of his existing request for a loan modification. (PF ¶ 13). He further claims that during these conversations, PNC representatives told him repeatedly that his request was under review. (Id.). Nevertheless, on September 16, 2009, PNC

proceeded to take steps toward the foreclosure of Leonard's Property by filing a

complaint in the Massachusetts Land Court seeking authority to foreclose on the

Mortgage pursuant to the Servicemember's Civil Relief Act.  (DF ¶ 17; Def. Ex. 8).  In

connection with that action, PNC filed an affidavit stating that it had mailed notices of

default to the Borrowers in compliance with Massachusetts law.  (Def. Ex. 8 at 3).  PNC

also submitted redacted copies of the notices along with its affidavit.  (Id. at 4-11).

## Plaintiff's Receipt of a Trial Period Plan

PNC claims that on or about September 23, 2009, Leonard submitted some, but

not all, of the documents necessary to establish his eligibility for a modification under

HAMP.  (See DF ¶ 28).  Thus, according to PNC's records, Leonard submitted a HAMP

Hardship Affidavit and various documents regarding his financial condition, but failed to

submit any materials reflecting his unemployment benefits.  (See Arthur Aff. ¶ 26; Def.

Ex. 18).  Again, however, Leonard disputes PNC's assertion that he did not provide it

with the requested information, and contends that all of his documentation was submitted

on time despite any letters to the contrary.  (See PR ¶ 28; Compl. ¶¶ 30-31; Pl. Ex. A at

90).  He also contends that the defendant repeatedly lost his information, and that he was

forced to submit the same documents to PNC on multiple occasions throughout 2009.

(Pl. Ex. A at 75, 81).  According to Leonard, if PNC indicated that something was

missing, he always submitted it as soon as possible.  (Id. at 81).

Despite PNC's assertion that Leonard's HAMP application remained incomplete,

it is undisputed that it sent Leonard a TPP on September 30, 2009.  (DF ¶ 29; PF ¶ 14).

Under the TPP, which was executed by the Borrowers on October 20, 2009, Leonard was required to make three monthly payments of approximately $1,511.  (PF ¶ 14).  The TPP also provided in relevant part as follows:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage....

> If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all my income ... to determine whether I qualify for the offer described in this Plan (the "Offer").  I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer.  This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

(Def. Ex. 20 at 1).  Additionally, the TPP stated that the Lender would suspend any scheduled foreclosure sale if the Borrowers continued to meet their obligations under the TPP.  (Id. at 2 ¶ 2(B)).

It is undisputed that Leonard made all of the monthly payments called for under the TPP, and that he did so in a timely manner.  (DF ¶¶ 31; PF ¶ 16).  Additionally, it is undisputed that he continued to submit documentation to the defendant in support of his application.  (DF ¶ 30; see also PF ¶¶ 18, 20).  The defendant's records indicate that at about the time he submitted his signed copy of the TPP, Leonard also submitted documents concerning his financial condition, including documents substantiating his receipt

of unemployment benefits for the weeks ending September 19, 2009 and October 10, 2009.  (Arthur Aff. ¶ 28; Def. Ex. 21).  Those records demonstrate that the plaintiff was continuing to collect benefits at a rate of $653 per week, and that he had a balance of $6,908 remaining in his unemployment account as of October 14, 2009.  (Def. Ex. 21 at 3-4).

### PNC's Denial of Leonard's HAMP Application

On January 7, 2010, PNC sent Leonard a letter informing him that he was at risk of losing his eligibility for a permanent HAMP modification if he did not submit documentation verifying all of his income within 30 days from the date of the letter.  (Def. Ex. 22 at 1).  Although the letter did not specify which income-related documents were missing from the plaintiff's file, PNC contends that at the time of the letter, it was missing a complete copy of the plaintiff's 2008 tax return, documents necessary to establish the amount of rental income that Leonard was receiving from a boarder, and documentation showing that the plaintiff would continue to receive unemployment benefits for the next nine months.  (Arthur Aff. ¶ 31).  Leonard disputes that his application was incomplete or that he failed to provide PNC with the requisite documentation.  (See PR ¶¶ 35-36).  He insists that he timely submitted all of the requested documentation, notwithstanding any letters to the contrary, and that he continued to work closely with PNC representatives to fulfill his obligations under the TPP.  (Pl. Ex. A at 90).

On March 24, 2010, PNC notified Leonard that it was unable to offer him a HAMP modification and was closing his application because he had failed to provide it

with the documents requested in its prior communication.  (DF ¶ 37; PR ¶ 37; Def. Ex. 25).  PNC also stated that "normal servicing of your referenced loan will continue, including collection and foreclosure proceedings, as well as negative credit bureau reporting, if applicable.  If these proceedings were previously suspended, they will begin once more."  (Id.).

Despite the defendant's written denial of Leonard's application, PNC representatives with whom Leonard continued to communicate told him that his application was still under consideration.  (PF ¶ 19; Pl. Ex. A at 79).  According to Leonard, this was not unusual, as each time he received a written notice saying that PNC would pursue foreclosure activities, or that he had not been approved for a modification, PNC representatives would encourage him to carry on the process of applying for a modification.  (Pl. Ex. A at 84).  They also would assure him that PNC would work things out for him. (Id.).

On March 31, 2010, Leonard received a letter from PNC in which the defendant stated:

> Thank you for sending the financial information requested in order to review your eligibility for a mortgage workout.  Upon reviewing your file, we have found that information is still needed to consider your request.  Please mail or fax the following information by April 15, 2010:
> [blank space in letter]
>
> Unless this information is received by April 15, 2010, or the foreclosure sale date, whichever occurs first, we will be forced to close your workout file.

(PF ¶ 21; Def. Ex. 26).  Thus, PNC confirmed that it was still considering Leonard for a workout, but it did not identify the information that it believed was still missing from his file.  (Def. Ex. 26).

The parties continued to communicate orally regarding the possibility of a loan workout, and on April 23, 2010, PNC sent Leonard a letter informing him that it had completed review of his "hardship assistance request (homeowner assistance package)." (Arthur Aff. ¶¶ 37-39; Def. Ex. 27).  The defendant explained that it could not approve his request because, "[b]ased on the information provided, it was determined that you have a deficit income."  (Def. Ex. 27).  It also informed him that normal servicing of his mortgage loan would continue, and that it intended to resume foreclosure proceedings. (Id.).  Leonard claims that shortly thereafter, PNC returned a portion of the money he had paid under the TPP without explanation, and indicated that it had referred his account to foreclosure, thereby terminating the TPP.  (PF ¶ 24; Compl. ¶ 41).[4]  He further claims that in doing so, the defendant breached its obligation to provide him with a permanent loan modification if he fulfilled his obligations under the terms of the TPP.  (See Compl. ¶¶ 65-68).

## **Leonard's Subsequent Efforts to Obtain a Loan Modification**

Leonard continued to speak with the defendant's representatives about possible workout options, and was told that he would need to begin the process all over again if he

---

[4]  According to Leonard's counsel, the plaintiff has paid over $10,000 into an escrow account, and has provided proof of such payments to PNC.

wished to be considered for a modification.  (See PF ¶ 25; Def. Ex. 28).  Leonard agreed,

and he proceeded to submit additional documentation, including a letter dated July 28,

2010 from the Massachusetts Department of Workforce Development, Division of

Unemployment Asssistance, stating that the plaintiff's unemployment benefits had been

approved until March 12, 2011.  (See Arthur Aff. ¶ 42).  Nevertheless, on September 3,

2010, PNC sent Leonard a letter informing him that information was still needed in order

to consider his request for a workout, and asking him to submit copies of pay stubs and

verification of his unemployment income by September 18, 2010.  (DF ¶ 44; Def. Ex.

30).

Subsequently, on October 15, 2010, PNC notified Leonard that it had received his

application for a HAMP modification, and would review his package for completeness

over the next 30 days.  (Def. Ex. 31).  Four days later PNC sent Leonard another letter in

which it informed him that certain information remained missing from his file.  (Def. Ex.

32).  Specifically, the letter indicated that "Arthur and Karen need to currently date the

4506-T form and the RMA.  Need to know the 'max amount' of unemployment that

Arthur is allotted.  Need Cynthia's 2 current paystubs to verify ability to pay rent and

occupancy.  Need 2 current bank statements that show rent deposits."  (Id. at 2).

Additionally, on November 22, 2010, PNC sent Leonard a second letter notifying him

that certain documents needed to review his application were missing or incomplete.

(Def. Ex. 33).  According to PNC, those documents included an executed Request for

Modification and Affidavit, tax returns from 2009, the plaintiff's most recent utility bill,

updated pay stubs for both Borrowers, and a copy of a lease agreement verifying rental income.  (Id.).  Once again, Leonard disputes that he failed to provide PNC with the requested documentation or that his application was incomplete, and contends that he would always send in any missing information as soon as possible.  (PR ¶ 48; Pl. Ex. A at 81, 90).

The record indicates that at some point in the late fall or early winter of 2010, Leonard was put on a second TPP, and that he began making the required payments. (Comp. ¶¶ 45-46).  However, on January 5, 2011, PNC notified the plaintiff that it had completed its review of his application, and could not approve or finalize his request for assistance under HAMP due to excessive forbearance.  (DF ¶ 49; Def.  Ex. 34).  As the defendant explained, "[w]e are unable to offer you a Home Affordable Modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of your loan beyond the requirements of the program."  (Def. Ex. 34).  Thus, PNC expressly declined to approve Leonard for a modification because the arrearage on the loan had become too great.  Furthermore, during further communications between the parties, PNC informed Leonard that a modi-fication also was not possible because, by that time, Leonard's unemployment benefits were close to expiring and he would not be able to demonstrate income for an additional nine months.  (Compl. ¶ 46).  The plaintiff claims that if PNC's representatives had acted promptly on his request for a modification, and had not repeatedly assured him that there was no need to resume his monthly mortgage payments, he would not have exhausted his

benefits and would not have fallen so far into default.  (Id. ¶ 49; PF ¶ 32).  He also claims that he might have been able to refinance his loan with another bank if he had not been misled by the assurances of the defendant's representatives that he could stop payments on his mortgage loan pending the results of his application for a HAMP modification. (Pl. Ex. A at 92).

### The Parties' Legal Proceedings

On September 15, 2011, the Harmon Law Office served the plaintiff with a Notice of Foreclosure indicating that the Property would be sold at auction on October 19, 2011. (PF ¶ 37).  One day later, on September 16, 2011, PNC filed another complaint in the Massachusetts Land Court seeking authority to foreclose on the Mortgage pursuant to the Servicemember's Civil Relief Act.  (See id. ¶ 36).  On that same date, Leonard's counsel sent PNC a demand letter pursuant to Mass. Gen. Laws ch. 93A ("Chapter 93A") in which she alleged that PNC's handling of Leonard's modification request constituted unfair and deceptive practices under Massachusetts law.  (PF ¶ 41; Def. Ex. 37).  Plaintiff's counsel also demanded that PNC approve a permanent modification of Leonard's mortgage loan, cancel the pending foreclosure auction, compensate Leonard for ongoing damage to his credit, and reimburse the plaintiff for attorney's fees.  (Def. Ex. 37 at 3).

On September 20, 2011, PNC acknowledged receipt of Leonard's demand letter and informed the plaintiff that "it may take some time to gather the information needed to accurately respond to your inquiry.  We will contact you in writing with the results by October 20, 2011."  (PF ¶ 41; Def. Ex. 38).  Therefore, PNC indicated that it would not

provide a substantive response to Leonard's Chapter 93A demand until after the scheduled foreclosure date of October 19, 2011.  It also made no offer to cancel or post-pone the auction, and proceeded to advertise the foreclosure sale.  (PF ¶ 43; Pl. Ex. C).  Consequently, on October 13, 2013, Leonard sought relief in this court by filing his Verified Complaint and an emergency Motion for Temporary Restraining Order to halt the foreclosure of his Property.  (PF ¶ 45; Docket Nos. 1 & 2).  The court granted Leonard's motion the following day, thereby forcing PNC to postpone the scheduled foreclosure.  (Id. ¶ 46; Docket No. 6).

In accordance with an agreement between the parties, PNC filed its Answer and provided a substantive response to Leonard's demand letter on November 18, 2011.  (PF ¶ 47).  The defendant denied any wrongdoing on its part, and asserted that Leonard was not eligible for a HAMP modification based on the documents and information submitted to PNC.  (Def. Ex. 39).  However, it did not raise any objection to the fact that Leonard had filed his Complaint 27 days after the date of his demand letter instead of waiting 30 days, as required under Chapter 93A.  (See PF ¶ 47; Mass. Gen. Laws ch. 93A, § 9(3)).  As described below, PNC now claims that the premature filing of the complaint bars Leonard's claim against it under Chapter 93A.

Additional factual details relevant to this court's analysis are described below.

### III.  ANALYSIS

### A.    Summary Judgment Standard of Review

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  Accordingly, the burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue." PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor." PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no

-23-

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id.

### B.      Count I: Alleged Violation of Mass. Gen. Laws ch. 244, § 35A

In Count I of his complaint, Leonard is seeking a declaratory judgment that PNC violated Mass. Gen. Laws ch. 244, § 35A by failing to provide the Borrowers with mandatory notice of their right to cure the default on their loan before seeking foreclosure of the Property, and by failing to file a copy of such notice in connection with its action in the Massachusetts Land Court.  Because the undisputed facts establish that PNC complied with the statute's notice requirements, the defendant is entitled to judgment as a matter of law on this claim.

### The Statutory Requirements

Mass. Gen. Laws ch. 244, § 35A ("Section 35A") provides borrowers with a period of time in which to cure a default prior to acceleration of a mortgage loan.  As the present version of the statute reads in relevant part:

> A mortgagor of residential property shall have a 150-day right to cure a default of a required payment as provided in the residential mortgage or note secured by the residential property by full payment of all amounts that are due without acceleration of the maturity of the unpaid balance of the mortgage....

Mass. Gen. Laws ch. 244, § 35A(b).  The statute also requires written notice of the borrower's right to cure, and provides for the delivery of such notice as follows:

> The mortgagee, or anyone holding thereunder, shall not accelerate maturity of the unpaid balance of such mortgage obligation or otherwise enforce the mortgage because of a default consisting of the

> mortgagor's failure to make any such payment in subsection (b) by
> any method authorized by this chapter or any other law until at least
> 150 days after the date a written notice is given by the mortgagee to
> the mortgagor....
>
> Said notice shall be deemed to be delivered to the mortgagor: (i)
> when delivered by hand to the mortgagor; or (ii) when sent by first
> class mail and certified mail or similar service by a private carrier to
> the mortgagor at the mortgagor's address last known to the
> mortgagee or anyone holding thereunder.

Id. § 35A(g).  In addition, under paragraph (j), "[a] copy of the notice . . . and an affidavit

demonstrating compliance with this section shall be filed by the mortgagee, or anyone

holding thereunder, in any action or proceeding to foreclose on such residential real

property."  Id. § 35A(j).

Section 35A was amended in 2010, and the current version became effective on

August 7, 2010.  See Orellana v. Deutsche Bank Nat'l Trust Co., Civil Action No. 12-

11982-NMG, 2013 WL 5348596, at *9 (D. Mass. Aug. 30, 2013); Historical & Statutory

Notes to Section 35A: 2010 Legislation.  Prior to that time, the statute provided for a 90

day right to cure, and precluded the mortgagee from accelerating maturity of the loan

balance or otherwise enforcing the mortgage due to default "until at least 90 days after

the date a written notice [was] given by the mortgagee to the mortgagor."  Historical &

Statutory Notes to Section 35A: 2010 Legislation.  Moreover, under the prior version of

the statute, the notice was "deemed to be delivered to the mortgagor when delivered to

the mortgagor or when mailed to the mortgagor at the mortgagor's address last known to

the mortgagee or anyone holding thereunder."  Id.  Thus, the earlier version of the statute

did not require the notice to be delivered by way of certified mail or similar service. However, it did require the mortgagee to file a copy of the notice and an affidavit demonstrating compliance with the notice provisions "in any action or proceeding to foreclose on such residential real property." Id.

### PNC's Compliance With Section 35A

The record demonstrates that PNC sent notices of default to each of the Borrowers by way of postage prepaid, first class mail on April 20, 2009.  (Arthur Aff. ¶ 12; Def. Ex. 7).  Therein, PNC explained that the plaintiff's mortgage loan was in default, and that the Borrowers had 90 days in which to cure the default.  (Def. Ex. 7).  Because the notices were sent prior to the amendments to Section 35A, the pre-2010 version of the statute applies in this case.  See Orellana, 2013 WL 5348596, at *9 (finding that pre-2010 version of Section 35A applied to notice of default dated prior to amendments).  Thus, PNC's action in mailing 90-day notices of default to the Borrowers was sufficient to meet the notice requirements of Section 35A.

The plaintiff argues that PNC is not entitled to summary judgment on this claim because he has no memory of receiving a default notice and no record of receipt in his files.  (Pl. Opp. Mem. (Docket No 42) at 19).  However, under the pre-2010 version of Section 35A, "it is sufficient for defendant to prove that the letters were mailed; it need not prove that they were delivered."  Biltcliffe v. CitiMortgage, Inc., 952 F. Supp. 2d 371, --- , 2013 WL 3466886, at *5 (D. Mass. July 10, 2013).  Here, an employee of the defendant has testified, based on his review of PNC's records and computer systems, that

PNC sent the notice of default to the Borrowers "by postage prepaid, first class U.S. Mail." (Arthur Aff. ¶ 12). The record also establishes that in connection with its September 2009 action under the Servicemember's Civil Relief Act, PNC filed an affidavit with the Massachusetts Land Court attesting to the fact that it had mailed notices of default to the Borrowers in compliance with Massachusetts law. (Def. Ex. 8 at 3). Therefore, PNC has established that the required notices were mailed, and that it complied with the relevant provisions of Section 35A.

In any event, the plaintiff's "mere lack of recollection does not suffice to create an issue of fact" as to whether PNC delivered notices of default to the Borrowers. I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc., 182 F.3d 51, 55 (1st Cir. 1999). Because Leonard has not presented any affirmative evidence indicating that a genuine issue exists as to whether PNC complied with the notice requirements of Section 35A, the defendant is entitled to judgment as a matter of law on Count I of the Verified Complaint.

### C. Count II: Claim for Breach of Contract

In Count II, Leonard asserts that PNC breached its contractual obligations to the plaintiff by cancelling his TPPs without offering Leonard a permanent loan modification or conducting a good faith evaluation as to whether he qualified for such a modification. The defendant argues that it is entitled to summary judgment on this claim because it did not breach the terms of its TPP agreements with the plaintiff. For the reasons that follow, this court recommends that the motion be denied with respect to Count II.

In order to prevail on a claim for breach of contract under Massachusetts law, the plaintiff must establish, "at a minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." Guckenberger v. Boston Univ., 957 F. Supp. 306, 316 (D. Mass. 1997). For purposes of its motion for summary judgment, PNC does not dispute that the TPPs constituted a valid contract or that the plaintiff sustained damages as a result of his failure to obtain a loan modification. Rather, it contends that it did not breach any contractual obligation that it owed to the plaintiff because Leonard failed to establish his eligibility for a permanent loan modification, as required under the terms of the TPPs. Specifically, PNC asserts that Leonard's failure to timely submit documentation demonstrating that his unemployment benefits would last for at least nine months relieved it of any obligation to provide the plaintiff with a permanent HAMP modification. (Def. Mem. at 10-11). However, this court finds that Leonard has raised a genuine dispute on this issue, and that the matter must be decided by a jury.

There can be no dispute that under the plain terms of the TPP agreements, PNC was not obligated to provide the plaintiff with a permanent loan modification unless he established his eligibility by submitting sufficient documents to verify his income. Thus, by executing the TPP on October 20, 2009, Leonard agreed that "[i]f I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payments and documents to permit verification of all of my income . . . to determine whether I qualify for the offer described in this Plan[.]" (Def. Ex. 20 at 1). He also acknowl-

edged that "the Plan is not a modification of the Loan Documents and that the Loan

Documents will not be modified unless and until . . . I meet all of the conditions required

for modification[.]"  Id. at 3 ¶ 2(G).  Moreover, as PNC informed Leonard through

correspondence sent to him on various occasions, in order to verify income for purposes

of HAMP, borrowers receiving unemployment benefits were required to submit docu-

mentation from the benefits provider showing that such benefits would continue for at

least nine months.  (See Def. Ex. 13 at 3; Def. Ex. 17 at 3; Def. Ex. 19 at 2; Def. Ex. 22

at 2).  Because Leonard was receiving unemployment throughout the relevant time

period, he was required to submit such documentation in order to establish his eligibility

for a loan modification under HAMP.

The evidence is undisputed that Leonard did, in fact, receive unemployment com-

pensation for well more than nine months.  Thus, the issue is whether PNC received

adequate proof of this fact during the lengthy application process.  PNC admits receiving

at least some correspondence and other documents on May 18, 2009 and in October 2009

indicating that Leonard had been receiving unemployment benefits since May 9, 2009.

(See Def. Exs. 14, 21).  It also admits that it received a letter dated July 28, 2010 from the

Massachusetts Department of Workforce Development, Division of Unemployment

Assistance stating that his benefits had been approved until March 12, 2011.  (See Arthur

Aff. ¶ 42).  PNC further admits that it sent Leonard a letter on March 31, 2010 stating

that Leonard was required to provide the "following information" but that the letter did

not identify what information was being requested.  (Def. Ex. 26; see also Def. Ex. 22

(letter to Leonard of January 7, 2010 requesting additional, but unspecified, information)).  The record is also clear that Leonard has testified unequivocally that he sent PNC all the information it requested, that PNC repeatedly lost the information, and that he sent some information more than once.  (See Compl. ¶¶ 25, 30-31; Pl. Ex. A at 75, 81, 90).  In addition to his testimony, Leonard's version of events is supported by, inter alia, the blank letter discussed above (Def. Ex. 26) and the fact that PNC sent Leonard letters inviting him to apply for a loan modification while it was allegedly considering his loan modification request.  (See Def. Exs. 13, 17).  Leonard's testimony and PNC's inconsistent recordkeeping create a genuine factual dispute as to whether Leonard submitted the documentation needed to verify his income.  This issue should be resolved by a jury.

The defendant argues that Leonard's evidence is inadequate to withstand summary judgment on the breach of contract claim because Leonard has not pointed to a particular document showing that he timely submitted the requested unemployment information to PNC.  (Def. Reply Mem. at 4-5).  This argument is not persuasive.  While the nonmoving party "may not rest upon 'conclusory allegations, improbable inferences, and unsupported speculation'" to defeat a motion for summary judgment, Leonard's reliance on testimony rather than documents does not render his evidence inadequate.  See Vineberg, 548 F.3d at 56 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F. 2d 5, 8 (1st Cir. 1990)).  Moreover, Leonard's insistence that he complied with PNC's requests for documentation, while lacking in detail, is further bolstered by evidence of PNC's

continued willingness to work with him for more than a year and a half in an effort to secure a modification, with the repeated assurances of PNC's representatives that the defendant would be able to work things out, and with PNC's decision to offer Leonard two separate TPPs.  Therefore, at a minimum, Leonard should have an opportunity to present the matter to a jury, and the defendant's motion for summary judgment on Count II of the Verified Complaint should be denied.

### D.    Count III: Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

PNC also has moved for summary judgment with respect to Count III of the Verified Complaint, in which Leonard asserts a claim for breach of the implied duty of good faith and fair dealing.  Specifically, in Count III, Leonard alleges that PNC breached the covenant of good faith and fair dealing implied in both the Mortgage and  the TPP agreements by telling Leonard that he could refrain from making monthly mortgage payments while his loan was under review; terminating his TPPs without a valid reason; failing to communicate accurately with the plaintiff regarding the status of his application for a loan modification; and "creating the very situation cited as [the] basis for the ultimate denial of his application by unjustifiably delaying the process[.]"  (Compl. ¶ 75).  Because PNC has not shown that it is entitled to judgment as a matter of law on this claim, this court recommends that its motion be denied with respect to Count III.

"Under Massachusetts law, every contract implies good faith and fair dealing between the parties to it."  Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir.

2013) (quotations, citation and punctuation omitted).  "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'"  Id. at 237-38 (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 924 N.E.2d 696, 704 (2010)).  "Put another way, the parties to a contract implicitly agree 'to deal honestly and in good faith in both the performance and enforcement of the terms of their contract.'"  Biltcliffe, 2013 WL 3466886, at *7 (quoting Hawthorne's, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211, 606 N.E.2d 908 (1993)).  Thus, "the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  Id. (quoting Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004)) (alteration omitted).  "In the lender-borrower context, the implied covenant 'would require that the bank be honest in its dealings with [the borrower] and that it not purposefully injure [his] right to obtain the benefit of the contract.'"  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009) (quoting Shawmut Bank, N.A. v. Wayman, 34 Mass. App. Ct. 20, 606 N.E.2d 925, 928 (1993)).

The defendant argues that Leonard's claim for breach of the implied covenant of good faith and fair dealing must fail because PNC acted appropriately with respect to the TPP agreements.  Specifically, according to PNC, "[t]here is no genuine issue that Plaintiff failed to provide documentation of his unemployment income until July 28, 2010 long after the TPP expired under its own terms."  (Def. Reply Mem. at 4).  Thus, PNC argues

that it was not obligated to offer Leonard a permanent loan modification, and that there can be no breach of the implied covenant of good faith and fair dealing.  (See id. at 3-4; Def. Mem. at 12).

The defendant's argument rests on a far too constricted reading of the evidence. As detailed above, Leonard has presented a genuine issue of material fact as to whether he submitted all of the documentation that was requested by the defendant, including documentation necessary to verify his income under the TPP agreements.  Accordingly, this court finds that the record is sufficient to support Leonard's claim that PNC deprived him of the fruits of his contractual agreements by terminating his first TPP without justification and causing such significant delays in the application process that Leonard became unable to demonstrate his eligibility for a modification under the second TPP.

PNC also takes issue with Leonard's claim that it breached the implied covenant of good faith and fair dealing by advising him not to make his mortgage payments while his modification request was under review.  Citing F.D.I.C. v. Villemaire, 849 F. Supp. 116 (D. Mass. 1994), PNC argues that a borrower cannot establish a breach of the implied covenant by relying on oral representations that contradict the express terms of the operative loan agreements.  (Def. Mem. at 13-14).  Thus, PNC reasons that because the 2008 Loan Modification required Leonard to make monthly mortgage payments, and expressly precluded him from relying on any alleged oral representations to modify the terms of that Agreement, the plaintiff cannot base his claim upon the oral advice of its customer service representatives that he had to stop making his mortgage payments for at

least three months in order to obtain a loan modification.   (See id.; Def. Reply Mem. at 5-6).

PNC's argument is insufficient to warrant summary judgment with respect to this claim.   As an initial matter, the defendant's reliance on Villemaire is misplaced.   It is true that the court in that case held that "the defendants' claims and defenses based on a breach of the implied covenant of good faith cannot withstand summary judgment because they are predicated solely on alleged oral agreements or representations." Villemaire, 849 F. Supp. at 121.   However, the court's ruling was based specifically on a federal common law doctrine of equitable estoppel, which has been codified at 12 U.S.C. § 1823(e), and "prevent[s] the borrower from using a secret agreement with the original lender as a defense to the [Federal Deposit Insurance Corporation's] demand for payment."   Id. at 120 (quoting In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1344 (1st Cir. 1992) (internal quotations omitted)).   See also id. at 121 (finding that under § 1823(e), borrowers' claim could not be premised solely on oral agreements or representations).   Consequently, the ruling applied only to cases in which the FDIC is a party, and it did not purport to bar claims outside of that context, which allege a breach of the implied covenant based upon the defendant's oral representations.   The defendant has not cited any authority, and this court has found none, that would preclude Leonard's reliance on PNC's oral statements to support his claim.   Therefore, the defendant has not shown that it is entitled to summary judgment on this basis.

To the extent PNC is arguing that the express language of the 2008 Loan Modification precludes Leonard's reliance on oral statements to modify the terms of his loan agreements, that argument too is unpersuasive. Leonard is not claiming that PNC's oral statements modified his existing agreements or absolved him of any payment obligations thereunder. Nor is he claiming that PNC's oral statements somehow compelled PNC to offer him a loan modification. Rather, he is claiming that the defendant's statements caused him to violate the terms of the 2008 Loan Modification and to fall into default on his Mortgage. He is also claiming that the defendant's representations that he could continue to withhold monthly payments while pursuing a new agreement resulted in his inability to demonstrate his eligibility for a HAMP modification under the second TPP. Therefore, Leonard has alleged that the defendant's conduct injured both his rights under the Mortgage and his ability to obtain a modification in accordance with the terms of the second TPP. This is sufficient to support a claim for breach of the implied covenant of good faith and fair dealing. See Young, 717 F. 3d at 238 (lack of good faith necessary to support claim for breach of the implied covenant of good faith and fair dealing may be established by evidence showing that the defendant's alleged conduct "had the effect of injuring the other party's rights to the fruits of the contract").

### E.   Count IV: Claim for Promissory Estoppel

In Count IV of his Verified Complaint, Leonard has asserted a claim for promissory estoppel based on the defendant's alleged assurances that he would receive a TPP if he qualified for a HAMP modification, and that PNC would then offer him a permanent

modification if he made timely payments under the TPP, as well as its assurances that he should not be concerned about making his mortgage payments because any arrearages would ultimately be rolled into a modified loan.  (See Compl. ¶¶ 77-81).  For the reasons described below, this court finds that this claim cannot survive as a matter of law.

### Promissory Estoppel Under Massachusetts Law

"Massachusetts law has rejected the 'promissory estoppel' label, treating estoppel-based contract claims as traditional contract claims with the caveat that reasonable reliance is used as a substitute for consideration."  Trent Partners & Assocs., Inc v. Digital Equip. Corp., 120 F. Supp. 2d 84, 104 (D. Mass. 1999).  See also Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 850, 647 N.E.2d 1174, 1179 (1995) ("an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than considera-tion").  "In practice, however, this distinction has not altered the elements of such a claim from the traditional promissory estoppel definition."  Trent Partners & Assocs., Inc., 120 F. Supp. 2d at 104.  Thus, to prevail on his claim, "the plaintiff[ ] must show that a promise was made which the promisor reasonably expected to induce reliance, that the promisee actually and reasonably relied on that promise, and that injustice can be avoided only by enforcement of the promise."  Id.

"An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on that representation."  Varadian, 419 Mass. at 848, 647 N.E.2d at 1178 (citing

Pappas Indus. Parks, Inc. v. Psarros, 24 Mass. App. Ct. 596, 599, 511 N.E.2d 621

(1987)).  "Such a promise is not sufficiently shown where it is 'made with an understood

intention that it is not to be legally binding, but only expressive of a present intention.'"

Trent Partners & Assocs., Inc., 120 F. Supp. 2d at 104 (quoting Varadian, 419 Mass. at

850, 647 N.E.2d 1174).  Thus, the Supreme Judicial Court has held that under Massa-

chusetts law, a statement or promise "made in the face of a written contract [is] not a

'promise' or 'commitment' for promissory estoppel purposes because the existence of a

written contract demonstrate[s] the parties intention that it would govern their . . . trans-

action."  Id. at 104-105.

### Insufficiency of Leonard's Claim

To the extent Leonard's claim for promissory estoppel is based on PNC's assur-

ances, set forth in the defendant's letters describing the HAMP modification process, that

Leonard would receive a TPP once he qualified for a modification and would then receive

a permanent modification if he timely made payments under the TPP, his claim must fail

as a matter of law.  There is no dispute that the TPP constituted an express contract,

which governed the parties' transaction.  (See Compl. at Count II (alleging breach of

contract claim based on TPPs); Def. Mem. at 14 (describing TPP as "an express contract"

that precludes claim for promissory estoppel)).  Therefore, the record establishes that the

defendant did not intend, and the plaintiff did not understand, any prior promises PNC

made with respect to the TPP to constitute a legally binding commitment.  See Varadian,

419 Mass. at 850, 647 N.E.2d at 1179 (finding that evidence "did not warrant a finding

that a 'promise' in the contractual sense had been made" where "both parties contemplated a written agreement that would govern the intricacies of a . . . construction loan").  In short, "no amount of reliance on the part of [Leonard] would give rise to a 'contract' by virtue of reliance."  Id.

Leonard's reliance on PNC's representations that he could stop making mortgage payments, and that any arrearages would be folded into a modified loan, is also insufficient to support his claim for promissory estoppel.  As an initial matter, the record does not indicate that either of the parties understood PNC's statements as a firm commitment to modify Leonard's loan.  See Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 340 (D. Mass. 2011) ("even where detrimental reliance acts as a substitute for consideration, the promise on which a claim for promissory estoppel is based must be interchangeable with an offer 'in the sense of commitment'" (quotations and citation omitted)).  Rather, as described above, the parties understood that no modification would occur unless and until the plaintiff satisfied the requirements of the TPP agreements. (See PF ¶ 15; Pl. Ex. A at 58).

Additionally, PNC's representations regarding Leonard's mortgage payments were too indefinite to support a claim for promissory estoppel.  "In addition to demonstrating a firm commitment, the putative promise, like any offer, must be sufficiently 'definite and certain in its terms' to be enforceable."  Id. at 341 (quoting Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 142 (D. Mass. 2009)).  "Under well-settled Massachusetts law, 'an agreement to enter into a contract which leaves the terms of that contract for future

negotiation is too indefinite to be enforced.'" Id. (quoting Caggiano v. Marchegiano, 327 Mass. 574, 580, 99 N.E.2d 861 (1951)).  The defendant's representations that Leonard would not qualify for a loan modification unless he stopped paying his mortgage for up to three months, and its promises that any arrearages would be rolled into a modified loan, are far too vague and indefinite as to the actual terms of a new loan to constitute an enforceable loan modification agreement.  Rather, they amount to nothing more than a promise to consider his application once he stopped making the payments.  Therefore, Count IV cannot withstand PNC's motion for summary judgment.

The plaintiff's reliance on the Dixon case does not alter this court's conclusion.  In that case, the plaintiffs based their promissory estoppel claim upon the defendant bank's promise to participate in negotiations to modify their mortgage loan if the plaintiffs took certain steps necessary to enter into a mortgage modification.  Id. at 340.  In reliance on the bank's representations, the plaintiffs "stopped making payments on their loan and submitted the requested financial information – only to learn subsequently that the bank had initiated foreclosure proceedings against them."  Id.  Accordingly, the plaintiffs sued the bank for promissory estoppel, arguing that the bank "ought [to] have anticipated their compliance with the terms of its promise to consider them for a loan modification."  Id.  However, they did not claim that the bank had made any promise to enter into a modification agreement.  See id.

The Dixon court determined that the plaintiffs' allegations were sufficient to state a claim for promissory estoppel based on the bank's promise *to consider* the plaintiff's

application for a loan modification.  See id. at 346.  Significantly, however, in connection with its analysis, the court determined that an agreement to enter into an actual loan modification would have failed to state a claim because "as [a] matter of law '[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligations on the parties thereto.'"  Id. at 342 (quoting Rosenfield v. United States Trust Co., 290 Mass. 210, 217, 195 N.E. 323 (1935)).  Consequently, in reaching its determination that the plaintiffs had stated a claim, the court relied on their  representations that they were not seeking specific performance of a promised loan modification, and were only seeking to enforce a verbal commitment by the bank "to determine their eligibility for a modifi-cation if they followed the bank's prescribed steps."  Id.  The court reasoned that by seeking to hold the bank to its promise to consider the plaintiffs for a loan modification, the plaintiffs were not attempting "to bind the bank to a final agreement it had not contemplated[,]" and that there was "no risk that [the] Court, were it to uphold the promissory estoppel claim, would be 'trapping' [the defendant] into a vague, indefinite, and unintended loan modification masquerading as an agreement to agree."  Id.

In the instant case, there is no dispute that PNC considered but then denied Leonard's request for a loan modification, and that Leonard is seeking to enforce a promise to enter into a loan modification agreement.  (See Compl. at Prayer for Relief (seeking a permanent injunction requiring PNC to modify Leonard's loan)).  As the court acknowledged in Dixon, "[t]o impose rights and duties at the stage of imperfect negotia-tion, would be to interfere with the liberty to contract – or not to contract."  Dixon, 798 F.

Supp. 2d at 341 (internal quotations and citation omitted).  Accordingly, the plaintiff's claim for promissory estoppel must fail as a matter of law, and the defendant's motion for summary judgment should be allowed with respect to Count IV.[5]

### F.   Count V: Claim for Negligence

By his next claim, which is set forth in Count V of the Verified Complaint, Leonard is seeking to hold PNC liable for negligence.  In support of this claim, Leonard alleges that PNC assumed a duty of care toward Leonard when it undertook to consider him for a loan modification and provided him with two separate TPPs.  He also alleges that PNC breached its duty of care by assuring Leonard that he could withhold monthly payments while his loan was under review, terminating his TPPs without justification, making inaccurate statements regarding the status of Leonard's application for a modi-fication, and creating the situation that ultimately led to the denial of Leonard's request for a HAMP modification.  However, because this court finds that PNC owed no duty of care to the plaintiff under the circumstances alleged here, this court recommends that the motion for summary judgment be allowed as to Count V.

"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage

---

[5]  In light of this court's determination that Leonard's claim for promissory estoppel must fail for the reasons detailed herein, it is not necessary to address the defendant's argument that Leonard did not detrimentally rely on PNC's statements that he would need to stop making his mortgage payments for at least three months if he wished to establish his eligibility for a HAMP modification.  (See Def. Mem. at 15).

resulted, and that there was a causal relation between the breach of the duty and the damage." Jupin v. Kask, 447 Mass. 141, 146, 849 N.E.2d 829, 834-35 (2006). Massachusetts courts ordinarily "consider the latter three questions – whether a defendant exercised reasonable care, the extent of damage caused, and whether the defendant's breach and the damage were causally related – to be the special province of the jury." Id. at 146, 849 N.E.2d at 835. "However, the existence [or nonexistence] of a duty is a question of law, and is thus an appropriate subject of summary judgment." Id.

In the instant case, Leonard cannot establish that PNC's actions in considering him for a loan modification and providing him with two TPPs gave rise to a duty of care. Under Massachusetts law, "a lender owes no general duty of care to a borrower." Corcoran v. Saxon Mortg. Servs., Civil Action No. 09-11468-NMG, 2010 WL 2106179, at *4 (D. Mass. May 24, 2010), and cases cited. See also Lee v. BAC Home Loans Servicing, LP, Civil Action No. 10-12226-GAO, 2013 WL 212615, at *3 (D. Mass. Jan. 18, 2013) (dismissing the plaintiff's negligence claim in case involving applications for a HAMP modification on the grounds that the lender "owed [plaintiff] no common law tort-based duty of care"). In addition, Massachusetts state courts have not recognized a duty of care under HAMP. See Markle v. HSBC Mortg. Corp., 844 F. Supp. 2d 172, 185 (D. Mass. 2011) (declining "the invitation to recognize in the HAMP guidelines a new duty of care, thus far unrecognized by Massachusetts courts"). Furthermore, "every Court of Appeals that has addressed the issue has denied HAMP-based negligence claims." Souza v. Bank of Am. Nat'l Ass'n, Civil No. 1:13-cv-10181-PBS, 2013 WL 3457185, at *4 (D.

Mass. July 8, 2013), and cases cited.[6]  Therefore, the defendant's motion for summary judgment as to Count V should be allowed.

### G.    Count VI: Claim for Violation of Mass. Gen. Laws ch. 93A

In the final Count of his Verified Complaint, Leonard claims that PNC engaged in unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, § 9.  The defendant argues that it is entitled to summary judgment on this claim because the plaintiff failed to comply with the notice requirements of Chapter 93A, and because he has failed to present facts to support his claim on the merits.  (Def. Mem. at 17-18; Def. Reply Mem. at 9-10).  Because PNC has not shown that it is entitled to relief on either basis, this court recommends that PNC's motion for summary judgment on Count VI be denied.

### The Notice Requirement

Chapter 93A provides in relevant part that "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."  Mass. Gen. Laws ch. 93A, § 9(3).

---

[6]  Speleos v. BAC Home Loans Servicing, L.P., 755 F. Supp. 2d 304, 311 (D. Mass. 2010), on which the plaintiff relies, does not compel a different result.  Speleos was a decision on a motion to dismiss, and the record was not fully developed.  The court merely refused to dismiss the negligence claim at the pleading stage.  Moreover, Speleos involved a completed foreclosure. In connection with a foreclosure, a bank owes a fiduciary duty to the borrower.  Pearson v. United States, 831 F. Supp. 2d 514, 519 (D. Mass. 2011) ("Massachusetts courts have determined that one such instance in which a fiduciary duty arises between a lender and a borrower is in the context of a foreclosure sale").

"The statutory notice requirement is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'" Rodi v. S. New England Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004) (quoting Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812, 333 N.E.2d 202, 204 (1975)). "Furthermore, 'as a special element' of the cause of action, it must be alleged in the plaintiff's complaint." Id. (quoting Entrialgo, 368 Mass. at 812, 333 N.E.2d at 204).

In the present case, there is no dispute that on September 16, 2011, the plaintiff served PNC with a Chapter 93A demand letter, and that he alleged as much in his Verified Complaint.  (See Def. Ex. 37; Compl. ¶ 91).  Nor is there any dispute that the demand letter contained the information required under Chapter 93A.  (See Def. Ex. 37). Rather, the only issue raised by the defendant's motion is whether Leonard's decision to file his complaint on October 13, 2013, three days short of the thirty-day notice period, is fatal to his claim under Chapter 93A.  (See Def. Mem. at 17-18; Def. Reply Mem. at 9-10).  For the reasons that follow, this court finds that it is not.

As an initial matter, the defendant has cited no cases "where the premature filing of a complaint constitutes a waiver of a plaintiff's right to assert a 93A action." McKensi v. Bank of Am., N.A., Civil Action No. 09-11940-JGD, 2010 WL 3781841, at *3 (D. Mass. Sept. 22, 2010).  Moreover, "[a]lthough there are instances in which the Massachusetts courts have adhered strictly to the 93A demand requirement, those cases typically involve instances in which there is neither evidence of a demand letter nor any mention of such demand in the plaintiff's complaint." S. States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 92 (D. Mass. 2007), and cases

cited.  As described above, Leonard has shown that he both issued a demand letter and alleged it in his complaint.  Accordingly, the timing of his suit does not support summary judgment in PNC's favor.  See McKensi, 2010 WL 3781841, at *3 (declining to dismiss plaintiff's Chapter 93A claim where the plaintiff filed his complaint five days after serving his demand letter in order to seek a temporary restraining order and halt the foreclosure of his property).

This court also finds that the plaintiff's demand letter was more than adequate to fulfill the purpose of the statutory notice requirement.  That purpose has been described as twofold: "first, to encourage negotiation and settlement and, second, to control the amount of damages recoverable by the plaintiff.  If a reasonable settlement offer is rejected by the plaintiff, recovery will be limited to the amount of the offer."  S. States Police Benevolent Ass'n, Inc., 241 F.R.D. at 92 (quoting Thorpe v. Mutual of Omaha Ins. Co., 984 F.2d 541, 544 (1st Cir. 1993)).  In this case, PNC had nearly the entire thirty day period to consider the merits of the plaintiff's demand and to make a settlement offer before Leonard filed his complaint.  At the very least, it had ample opportunity to start negotiations that might have enabled the parties to avoid litigation.

The circumstances presented in this case also demonstrate that the purposes of the notice requirement would not have been advanced if Leonard had waited another three days to file his complaint.  In its September 20, 2011 letter acknowledging receipt of Leonard's demand, PNC indicated that it would provide a substantive response by October 20, 2011, after the thirty day notice period had expired.  Accordingly, the record

indicates that the only difference it would have made if Leonard had allowed the thirty day period to run before filing suit is that the foreclosure of his Property, which was scheduled for October 19, 2011, would not have been avoided.  (See Def. Ex. 38; PF ¶ 37).  The evidence thus shows that the parties' dispute would have been exacerbated, and the purposes of the demand letter requirement would have been frustrated, if Leonard had waited any longer before filing his complaint and seeking a temporary restraining order from the court.  Therefore, this court finds that Leonard's failure to adhere more strictly to the statutory notice requirement does not support summary judgment in PNC's favor.

### The Merits of Leonard's Chapter 93A Claim

The defendant argues that even if Leonard complied with the notice requirements, his claim must fail on the merits because the delay in PNC's consideration of his application for a loan modification was caused by Leonard's failure to provide the necessary documentation regarding his unemployment benefits, and there is no further evidence of unfairness on the part of PNC.  (Def. Reply Mem. at 10).  This court disagrees, and finds that when the evidence if viewed in the light most favorable to Leonard, it supports his claim that PNC's conduct was unfair and deceptive under Chapter 93A.

"To prevail on a Chapter 93A claim, the plaintiff 'must prove that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result.'"  Morris v. BAC Home Loans Servicing, L.P., 775 F. Supp. 2d 255, 259 (D. Mass. 2011) (quoting Brandon Assocs.,

LLC v. FailSafe Air Safety Sys. Corp., 384 F. Supp. 2d 442, 446 (D. Mass. 2005))

(alteration in original).  "Although Chapter 93A does not specifically define 'unfair' or

'deceptive,' the Massachusetts courts have applied a three-step analysis to determine

whether conduct is unfair under the Act."  Id. at 262.  In particular, "[t]hey consider '(1)

whether the practice is within at least the penumbra of some common-law, statutory, or

other established concept of unfairness; (2) whether it is immoral, unethical, oppressive,

or unscrupulous; and (3) whether it causes substantial injury to consumers.'"  Id. (quoting

Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir.

2005)).  In the HAMP context, evidence that "defendants misrepresented to plaintiffs the

status of their HAMP application, their rights under HAMP, or their eligibility for a

permanent loan modification; misrepresented to plaintiffs the likelihood or imminency of

foreclosure; or actually conducted a foreclosure sale in violation of HAMP guidelines" is

considered sufficiently unfair or deceptive to support a claim under Chapter 93A.

Markle, 844 F. Supp. 2d at 186.

Leonard has presented sufficient facts to support his claim against PNC under

Chapter 93A.  For example, but without limitation, Leonard has presented evidence

showing that PNC misled him into believing that if he completed the requested paper-

work and made his trial period payments on time, he would be approved for a permanent

loan modification and PNC would not pursue the foreclosure of his Property.  See id.

(misrepresentations regarding a plaintiff's eligibility for a permanent loan modification

provide evidence of unfair or deceptive practices for purposes of Chapter 93A); Bosque,

762 F. Supp. 2d at 353-54 (same).  In addition, Leonard has shown that PNC representa-

tives repeatedly misled him about the need to continue making monthly mortgage pay-

ments while his application for a permanent modification remained pending.  See Okoye

v. Bank of New York Mellon, Civil Action No. 10-11563-DPW, 2011 WL 3269686, at

*6 (D. Mass. July 28, 2011) ("Conduct is 'deceptive'" within the meaning of Chapter

93A "when it has 'the capacity to mislead consumers, acting reasonably under the cir-

cumstances, to act differently from the way they otherwise would have acted'" (quoting

Aspinall v. Philip Morris Cos., 442 Mass. 381, 813 N.E.2d 476, 488 (2004))).  Because

this evidence is adequate to show that the defendant engaged in unfair or deceptive

practices within the meaning of Chapter 93A, the motion for summary judgment should

be denied with respect to the final Count of the Verified Complaint.

## IV.  CONCLUSION

For all the reasons described herein, this court recommends to the District Judge to

whom this case is assigned that the "Defendant's Motion for Summary Judgment"

(Docket No. 31) be ALLOWED IN PART and DENIED IN PART.  Specifically, this

court recommends that the defendant's motion be allowed with respect to Counts I, IV

and V of Leonard's Verified Complaint, but denied with respect to Counts II, III and VI.[7]


            / s / Judith Gail Dein
          Judith Gail Dein
          United States Magistrate Judge

---

[7] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).